SARAH JOSEPHINE CRUMLISH,

*vs.*

SECURITY TRUST AND SAFE DEPOSIT COMPANY.

*New Castle, Sept. T.* 1899.

A voluntary settlement was made by a married woman, under which she was to receive the income for life, with power of appointment of the trust estate, or in default thereof, the same was to be divided among children and the issue of any deceased, or, if no children, to the administrator of the settlor; there was no power of revocation although the settlor alleged and testified that she had made the deed believing that she "could break it," but there was no other evidence of her being told this except by her husband, who joined in the assignment. The settlor had inherited about twenty thousand dollars and managed it herself until her marriage, which was a "runaway match," and within a week of that time she drew in cash over nine thousand dollars of her fortune, all of which was expended within less than four months. The deed of settlement was prepared under the direction of the trust officer of the trustee, a corporation, and with him the settlor had several consultations about the matter, the two having been brought into conference by a brother-in-law of the settlor, who had no other legal advice or instruction as to the effect of the paper, except from the trust officer. At the time of making the settlement she obtained from the trustee a loan on other property as collateral, and to obtain this, she claimed was the inducement to make the assignment, although it appeared to have been

done with an intention to put the property out of her own control. The creation of the trust was known to and advised by the settlor's relations and friends. Her husband was a bookmaker at the races, and there were in proof admissions by him of his having lost as high as two thousand dollars a day. Upon a bill filed by the settlor against the trustee, to set aside and annul the settlement; *held:*—

1. That the main purpose of the trust settlement was to protect from the extravagant folly of her husband all that remained of the settlor's property, and that she made the settlement voluntarily, understandingly, and with full realization that the only way to effect its purpose was to put it out of her own power to surrender her property to him in response to future solicitations or demands.

2. That an absolute power of revocation would have defeated the purpose of the settlement and rendered it nugatory, so far as its main object was concerned, is so obvious that it seems impossible to believe that the settlor was not aware of it.

3. That a settlement made under such circumstances should not be disturbed or set aside.

Where, upon a bill in equity to set aside a voluntary conveyance, the intent to make an irrevocable gift is apparent, or where, even in the absence of such a clear intent, a sufficient motive (such as the protection against the grantor's own extravagance, or the like) for making such a gift exists, the settlement cannot be disturbed. The absence of a power of revocation in such a settlement will not be considered *prima facie* evidence of mistake where there appears either an intent to make an irrevocable gift or a sufficient motive for making it.

There is a noticeable difference between many of the English and the American cases in the consideration given by them, respectively, to the absence of a power of revocation as evidence in itself of mistake, on account of which a voluntary deed or settlement should be set aside; which may in general be accounted for by the difference in the character of the cases, and the nature of the estates affected, and also by the greater simplicity and economy of equity procedure in the American courts.

Absence of a power of revocation in a voluntary settlement is not *prima facie* evidence of mistake, and therefore, if unexplained, fatal to the instrument, but it is merely a circumstance to be taken into account and weighed in connection with the other circumstances in the case.

Where the purpose of a voluntary settlement is such that a power of revocation would be likely to defeat it, the absence of such power will not be held to be *prima facie* evidence of mistake

BILL IN EQUITY TO SET ASIDE A VOLUNTARY SETTLE-
MENT.—The complainant had made an assignment to the
respondent, as trustee, of securities constituting practically
her whole estate, and valued at about eight thousand dollars.
The assignment bore date January 21, 1891, and set forth
in detail certain trusts for the benefit of the complainant dur-
ing her life, with a power of appointment to the settlor, or
in default thereof, a direction to divide the fund among such
children of the complainant as should be living at the time of
her death, the issue of any then dead to take equally the share
of the parent; if the complainant should die intestate without
leaving children or issue to survive her, then the fund should
pass to her administrator to be distributed according to the
statute.

The bill sought to have this settlement annulled and
set aside and the securities returned by the trustee to the
complainant. The respondent filed an answer denying the
equity of the bill, and, on November 28, 1896, an examiner
was appointed, before whom the taking of testimony was
concluded July 6, 1897.

The testimony was very voluminous and is fully analyzed
and stated, so far as necessary in the opinion, in which also
are contained the exact terms of the settlement.

*P. L. Cooper, Jr.* and *A. C. Gray*, for the complainant.

In support of the case made by the bill we submit the
following propositions:

1. It is a well settled rule, as well settled as any other
rule of law or equity, that an executed voluntary settlement,
not tainted with fraud or effected by mistake, is binding on
the settlor.

This rule has been repeatedly declared and most cer-
tainly is not disputed by us.

2. On the other hand, an equally well settled rule is that
an instrument obtained by fraud, or which is executed under
a mistake, and so as not to correctly represent the intention
of the party executing the same, will be set aside on the appli-
cation of the grantor.

A principle so well recognized as this seems to require

no citations in its support. The courts have always recognized it, but the different. courts have grounded it upon two different reasons: (a) Courts have held it to be an exception in equity to the maxim *ignorantia· juris non excusat*. (b) Courts have held that fraud or mistake should always be treated as questions of fact.

3. Mistake in a voluntary conveyance, whereby the intention of the settlor is not carried out, is fatal, and the absence of a power of revocation is *prima facie* evidence of mistake.

4. It is the duty of the solicitor or scrivener who prepares the instrument, to see that the irrevocable nature of the settlement is fully understood by the settlor, and if the power of revocation is not in the instrument, the *onus* is upon those who desire to uphold it to explain the omission.

5. It is the duty of any of the other parties to a voluntary settlement, when advising the maker, to suggest that he take independent legal advice, and if this duty is not performed, the *onus* is upon them to show why the instrument should stand.

As the various cases to be cited nearly always contain a consideration of more than one of .the principles covered by the propositions above stated, it seems more convenient to consider these propositions together.

The ancient doctrine undoubtedly was that a voluntary settlement not obtained by fraud is binding on the settlor, and will not be set aside in equity, nor did the old decisions make any point of the fact that a power of revocation in such a settlement is not preserved. *Villers vs. Beaumont*, 1 *Vern.* 100; *Petre vs. Espinasse*, 2 *M. & K.* 496; *Bill vs. Cureton*, *id.* 503.

This doctrine has, however, long since been materially qualified and amended, and the recent cases have held not only that the absence of a power of revocation throws on a person seeking to uphold the settlement the burden of proving that such a power was intentionally excluded by the settlor, and that in the absence of such proof a settlement may be set aside, but that equity will set aside the settlement on appli-

cation of the settlor, where it appears that he did not intend to make it irrevocable. *Bisph. Eq. sec.* 67; *Huguenin vs. Baseley,* 14 *Ves.* 293, 2 *Wh. & Tud. L. Cas. Eq. (Pt.* 1) 597; *Phillipson vs, Kerry,* 32 *Beav.* 628; *Russell's Appeal,* 75 *Pa. St.* 269; *May, Voluntary and Fraudulent Conveyances, (Ed.* 1872) 452; *Nanney vs. Williams,* 22 *Beav.* 452; *Coutts vs. Acworth, L. B.* 8 *Eq.* 558; *Everett vs. Everett, L. R.* 10 *Eq.* 405; *Forshaw vs. Wellsby,* 30 *Beav.* 243.

It is not enough to show that the settlor read the deed, or that it was read to him, or that he understood it "as well as any unprofessional man could be supposed to do," but it must be established that it was so explained to him, that he might understand it; *Nanney vs. Williams,* 22 *Beav.* 452; especially if any of the usual clauses are omitted. *Wollaston vs. Tribe, L. R.* 9 *Eq.* 44.

The circumstances that the deed was prepared by the solicitor of the trustee and that the complainant was advised with respect to it only by the trust officer of the respondent, who testified only that he *thought* he read over the settlement to the complainant, is of itself, upon the principles laid down in many of the cases, sufficient to warrant the Court in setting aside the settlement' *Everett vs. Everett, L. R.* 10 *Eq.* 405; *Prideaux vs. Lonsdale,* 1 *D. J. & S.* 433.

Even in cases which hold that the mere absence of a power of revocation is not of itself conclusive, but is merely a circumstance to be considered by the Court where such a power is absent, it required very slight supporting circumstances to induce the courts to set aside the settlement. *Hall vs. Hall, L. R.* 14 *Eq.* 365; *Toker vs. Toker,* 3 *D. J. & S.* 487.

In all cases it is recognized as a general rule that in order to support the settlement it must be shown that the nature of the deed was thoroughly understood by the person executing it. *Phillips vs. Mullins, L. R.* 7 *Ch. App.* 244; *Smith vs. Iliffe, L, R.* 20 *Eq.* 666; *Moore vs. Prance,* 9 *Hare* 299; *Cooke vs. Lamotte,* 15 *Beav.* 234; *Wollaston vs. Tribe, L. R.* 9 *Eq.* 44; *Hanley vs. Pearson, L. R.* 13 *Ch. Div.* 545; *Lovesy vs. Smith, L. R.* 15 *Ch. Div.* 655; *Dutton vs. Thompson, L. R.* 23 *Ch. Div.* 278; *Russell's Appeal,* 75 *Pa. St.* 269; *Garn-*

*sey vs. Mundy*, 24 *N. J. Eq.* 243; *Kerr vs. Couper*, 5 *Del. Ch.*
507; *Griswold vs. Hazard*, 141 *U. S.* 260; *Albany City Sav.
Inst. vs. Burdick*, 87 *N. Y.* 40; *Canedy vs. Marcy*, 13 *Gray*
373; *Haussman vs. Burnham*, 59 *Conn.* 117; *Eastman vs.
Provident Relief Asso.*, 65 *N. H.* 176; *Hall vs. Otterson*, 52
*N. J. Eq.* 522, 28 *Atl.* 907.

The principle that the burden of proof to sustain the
validity of a voluntary settlement rests on those who seek to
maintain it, is recognized in many of the cases, but it is stated
with special force in *Phillipson vs. Kerry*, 32 *Beav.* 628; *Sharp
vs. Leach*, 31 *Beav.* 491; *Miskey's Appeal*, 107 *Pa. St.* 611.

The principle upon which the courts deal with such cases
as this has been well summarized in the note appended to
the case of *Chapman vs. Long*, 1 *A. & E. Dec. in Eq.* 265:

"Relief may be given where an instrument, although le-
gal in shape, fails to carry out the real intent of the parties
to the contract or transaction of which it forms a part, so
long, that is, as the rights of third parties have not intervened.
And this, whether the mistake is a mere scrivener's blunder,
*Elliott vs. Sackett*, 108 *U. S.* 132; *Monroe vs. Skelton*, 36 *Ind.*
302; *Bush vs. Merriman*, 87 *Mich.* 260; or the papers fail,
for other causes, to carry out the real intent of the whole
transaction." *Anderson vs. Pignet*, L. R. 8 *Ch. App.* 180.

In some cases, the courts, in order to avoid seeming to
trespass upon the rule of equity that relief will not be given
in case of mistake of law, have declared that when a paper is
executed in reliance on the statement of the draftsman, which
is erroneous in law, the mistake of the person executing it is
not a mistake of law but of fact. I *Am. & E. Dec. in Eq.*
269; *Bush vs. Merriman*, 87 *Mich.* 260; *Gross vs. Leber*, 47
*Pa. St.* 520.

The facts of the case as presented by the evidence were
examined and discussed at length, and the legal propositions
contended for were applied to them in detail.

*B. Nields* and *J. P. Nields*, for the respondent, after a
critical examination and extended discussion of the proofs
in the cause, contended that three propositions of law which

control this case will be found to be well settled by the decisions, both English and American.

1. A voluntary declaration of trust with no power of revocation, cannot be set aside except upon proof of mental incapacity, mistake, fraud or undue influence.

2. In a suit by the settlor of a voluntary settlement with no power of revocation against the trustee, to set aside the settlement on the ground of mistake, the settlor must prove to the satisfaction of the court that a mistake sufficient in law did exist at the time of the execution of the settlement.

3. The absence of a power of revocation in such a settlement is not *prima facie* evidence of mistake.

For some years, indeed until quite recently, it was considered that, where a trust was voluntary, and the settlor invoked the aid of the court to set it aside, the *onus* was immediately cast on the beneficiaries of showing that all the provisions of the settlement were proper and usual, or, that if there were any unusual provisions, they were brought to the knowledge of, and were understood by the settlor; *Phillips vs. Mullings, L. R. 7 Ch. App.* 244; and in particular, the absence of a power of revocation was considered to be fatal unless it could be conclusively shown that the settlor had been advised to insert one, and had deliberately elected not to do so; *Coutts vs. Acworth, L. R. 8 Eq.* 558; *Wollaston vs. Tribe, L. R. 9 Eq.* 44; *Everett vs. Everett, L. R. 10 Eq.* 405. This view, was, however, dissented from by the Court of Appeals in *Hall vs. Hall, L. R. 8 Ch. App.* 430, and by the late Sir George Jessel, M. R., in *Dutton vs. Thompson, L. R. 23 Ch. Div* 278, and appears to be no longer law. * * * This case coupled with *Hall vs. Hall, L. R. 8 Ch. App.* 430, *Phillips vs. Mulings, supra,* and *Henry vs. Armstrong, L. R. 18 Ch. Div.* 668, must be taken to have definitely overruled the previous decisions in *Coutts vs. Acworth, Wollaston vs. Tribe* and *Everett vs. Everett,* and to have left the *onus* of showing mistake, fraud, or undue influence upon the settlor in all cases, except those in which the provisions of the settlement are so absurd as to raise a presumption that no sane person would have agreed to them knowingly, and except cases in which the

beneficiary occupied at the date of the settlement a fiduciary position towards the settlor, in which latter there is a strong *prima facie* presumption of undue influence which casts the *onus* of supporting the settlement on the beneficiary as in *Hugenin vs. Basely*, 14 *Ves.* 273; *Hylton vs. Hylton*, 2 *Ves.* 547; *Hunter vs. Atkyns*, 3 *Myl. & K.* 113; *Tate vs. William-son*, *L. R.* 2 *Ch. App.* 55; *Allcard vs. Skinner*, *L. R.* 36 *Ch. Div.* 145; *Morley vs. Laughnan*, [1893] 1 *Ch.* 736.

The true rule is that which was laid down by Lord Justice Turner, that the absence of a power of revocation is a circumstance to be taken into account and is of more or less weight according to the other circumstances of each case. *Toker vs. Toker*, 3 *DeG. J. & S.* 487.

In the American cases the tendency and disposition of the courts is much more in favor of supporting such voluntary trusts than that manifested by the English courts in the earlier cases to which we have referred, and it is fully in accord with the later English cases, which have modified if not entirely overruled the earlier English cases, with respect to the effect of the absence of a power of revocation.

In a series of well considered cases in Massachusetts it was held that in such cases as this the burden of proof is not upon the respondent to show that the complainant understood the deed. *Taylor vs. Buttrick*, 165 *Mass.* 547; *Thurston, petitioner*, 154 *Mass.* 596, 26 *Amer. St. Rep.* 278; *Keyes vs. Carleton*, 141 *Mass.* 45.

So also the absence of a power of revocation in a settlement does not invalidate it, and where a voluntary settlement is completely executed, without any circumstances, tending to show mental incapacity, mistake, fraud, or undue influence, it is binding and will be enforced against the settlor and his representatives, and cannot be revoked, except so far as a power of revocation has been reserved in the settlement. *Viney vs. Abbott*, 109 *Mass.* 300.

It being clear from the evidence that the purpose of this settlement was to put the property out of the control of the settlor, a power of revocation would not have been proper; it would have been, on the contrary, inconsistent with the

object of the deed, and in such cases a settlement should not be set aside because it contains no power of revocation. *Parker vs. Allen*, 14 *N. Y. Supp*. 265; *Reidy vs. Small*, 154 *Pa. St*. 505.

In this case the proofs show that the effect of the deed was made known to and fully understood by the complainant, and there was, therefore, no mistake in the sense that she thought the deed contained any other or different provision than that which it did contain, and no accident in the sense that anything was omitted which was intended to be put in. *Keyes vs. Carleton, supra*.

It was not necessary that the complainant should understand all the technical intricacies of the transaction, but only in a general way the condition of the estate and the purpose to be accomplished by the settlement and the mode of effecting it. *Neal vs. Black*, 177 *Pa. St*. 83, 35 *Atl*. 561.

The case of *Kerr vs. Couper*, 5 *Del. Ch*. 507, has no application to the present case. It was unquestionably properlv decided for the reasons given by the Chancellor in his opinion.

THE CHANCELLOR:—

The complainant, Sarah Josephine Crumlish, on the 21st day of January, 1891, made an assignment to the respondent, the Security Trust and Safe Deposit Company, as trustee, of certain securities, which constituted at that time nearly the whole of her estate and had a market value of seven or eight thousand dollars, the terms of the trust or settlement being expressed in a declaration of trust executed concurrently, by the respondent, as follows:

"IN SPECIAL TRUST to collect and receive the interest, income, and dividends there on with power to call in any or all of the sums of money secured by said mortgages and to sell said shares of stock and re-invest the money received thereon in other good securities and after deducting for its services in the care and management of said mortgages and stocks ten per centum of the interest, income and dividends received therefrom to pay over unto the said S. Josephine Crumlish all the residue of said interest, income, and dividends when

and as received by it as aforesaid, for and during the term of her natural life.

"AND UPON THIS FURTHER TRUST, That at and upon the death of the said S. Josephine Crumlish to assign, transfer and set over unto such person or persons, as the said S. Josephine Crumlish may by her last will and testament, or any instrument in the nature of a last will and testament, appoint to receive the same, all of said mortgages and shares of stock, or such mortgages, securities or other stocks, in which the said Company may have reinvested said funds and in default of such appointment then to divide and pay over the said funds unto the children of the said S. Josephine Crumlish living at the time of her decease, and if any of her children should be then dead, leaving issue, such issue to take among them equally only the share their parent would have taken if living.

"AND UPON THIS FURTHER TRUST, That if the said S. Josephine Crumlish should die intestate without leaving any child, children or issue to survive her, that then in such case to pay over the whole of said fund to the administrator of the said S. Josephine Crumlish to be distributed according to the statute in that behalf."

By her bill filed May 9, 1896, she seeks to have the settlement annulled and set aside, praying as follows: ·

"3. That there be a decree of this Honorable Court declaring said declaration of trust void and that the same be delivered up to be annulled and cancelled.

"4. That this Honorable Court may decree and direct said respondent to deliver up to your said orator the mortgages, stocks, and other property in this bill of complaint mentioned or other securities or money into which said property has been converted by the said Security Trust and Safe Deposit Company."

The respondent filed its answer, denying all the equities of the bill, on the 28th day of November, 1896, when an examiner was appointed, and the taking of testimony before him was concluded July 6, 1897.

Subsequently the cause came to a hearing before me on bill, answer, proofs and exhibits.

From the case as presented, it appears that the facts immediately preceding and accounting for the creation of the trust, and the circumstances under which it was made, that are admitted or uncontradicted, are as follows:

The complainant was the daughter of John S. Brady, a resident of the City of Wilmington, with whom she lived until the day of her marriage to William G. Crumlish, September 4, 1891, when, as she states, she was about twenty-nine years old. She had inherited from her mother, who died in 1874, property which she managed herself from the time she came of age until her marriage with Crumlish, at which time it consisted of between nine and ten thousand dollars on deposit in the Equitable Guarantee and Trust Company and a few hundred dollars on deposit in the Union National Bank, the securities described in the declaration of trust, and twenty-three shares of Pennsylvania Railroad stock, together with a one-tenth interest in a hundred thousand dollar mortgage on real estate in Philadelphia and a one-sixteenth interest in seven brick houses and seven vacant lots in West Philadelphia.

The marriage was described by her father to be a "runaway match," of which he had no notice or knowledge in advance, and her husband testified that he was an "opera singer" before the marriage, and that after the marriage he became a "bookmaker" in New York, where he and the complainant went to reside immediately after the marriage ceremony. He described a bookmaker to be "a man who will handle other people's money on a percentage for handling it, for placing of odds on horses."

Within a week after her marriage, Mrs. Crumlish withdrew from the Equitable Guarantee and Trust Company her deposit of over nine thousand dollars by a draft to her own order sent on from New York, and on the 24th day of December, three months and twenty days after her marriage, she was brought back to Wilmington by her husband and his sister, who acted as her nurse, sick and suffering, and, as she

states in her testimony, penniless, except for the securities which she afterwards assigned to the respondent in trust, and the twenty-three shares of Pennsylvania Railroad stock, which she assigned to it as collateral for a loan of eight hundred dollars, when she made the settlement in trust of her remaining securities.

These securities, when she married and went to New York, had been left by her at her father's house in a drawer of a bookcase or secretary, and, at her written request were taken charge of by her father and put by him in a box which he rented for that purpose in the Union National Bank of Wilmington.

When she arrived in Wilmington she was taken to the house of Dr. Ogle, who was married to a sister of her husband, and there received the medical attention and care which she required, Dr. Ogle testifying that "she was suffering, and had been for months, from a diseased knee." He had been "in consultation in New York two or three times with her doctor and she had two or three others." And he adds that "she was suffering a great deal of pain physically and was in a terrible condition when she came to our house."

At the complainant's request, Dr. Ogle went to see Mr. Rossell, the trust officer of the respondent, about the creation of a trust which he advised her to make. Mr. Rossell called upon her shortly afterwards, as requested and "the most of the conversation at that interview was taken up with questions put by her as to the nature of a trust and his answers," explaining that under a declaration defining the duties of a trustee it would secure to her the payment of the income and a proper distribution at her death. At the close of the interview she gave Mr. Rossell the following letter to deliver to her father.

"Dear Pa:

I am going to put all my personal property in the Security Trust Co. and I have asked Mr. Rossell to call and get my papers from you. You will please oblige me by giving them to him.

Yours Josie."

When he called upon her father and presented this let-

ter, Mr. Brady expressed the opinion that the creation of the trust was unnecessary, and the expense would be avoided by allowing her securities to remain as they were, &c.   Shortly afterwards, however, on the 19th day of January, he appeared at the respondent's offices and delivered the securities to Mr. Rossell, having in the meantime written to the complainant, —his letter not being produced by the complainant, although its production was demanded,—and having received from her the following reply.

"Dear Pa:

    I am very sorry that I can not comply with your request but I think under the circumstances and the hard feelings that you have manifested since my stay in Wilmington that it is best for me to stay away.  I don't want to have any unpleasant scenes or talk and besides I can not go out on account of my leg.

                                        Yours Josie."

After several other conversations with Mr. Rossell, and consultations with her husband and friends, she finally, on the twenty-first day of January, 1891, created the trust, above quoted and described, her husband joining with her in executing a confirmation  or acknowledgement of  her assignment of the securities, upon the terms set forth in the declaration of trust.

The complainant in her bill, after setting forth that she had managed her own property for many years prior to the 21st day of January, 1891, and that her father had the securities above described in a safe deposit box in the Union National Bank when she came back to Wilmington, alleges that she then requested her father to give her the securities and he positively refused so to do, "except upon the condition that she would deliver them to the Security Trust and Safe Deposit Company to be held in trust during her life, and that if she would so deliver them the Trust Company would loan her eight hundred dollars on her Pennsylvania Railroad stock, thus affording her immediate relief from her strained condition;" that she "was entirely unwilling to accept the proposition and resented this arbitrary attempt to dispose of her property, and repeatedly applied to her father for possession

of her property, but he persisted positively in his refusal to give it up, except upon the terms stated, and hence she was forced to accept the declaration of trust as she required money immediately for medical treatment."

The sixth paragraph of the bill is as follows:

"That your orator after consultation with her husband William G. Crumlish, and other friends, accepted the said proposition but with the distinct understanding, however, that such Deed of Trust should be for a period of five years only, and at the expiration of that time your said Orator would again have complete and full control of her said property; that when your Orator was ready to comply with said understanding, her said father refused to surrender her said property unless your Orator should make the Deed of Trust for the term of her life; that thereupon your Orator being in absolute need, in ill health, and without legal advice, and being urged thereto by her said relatives became utterly hopeless of immediately obtaining her said property, and was prevailed upon, against her will and desire, to consent to the said terms; that thereupon your said Orator caused to be delivered to the said respondent the stocks and securities aforesaid, and that on January 21st, 1891, the said respondent executed a Declaration of Trust to your said Orator, a copy of which is hereto appended, marked Complainant's Exhibit 'A.' "

These allegations of the bill are not only not sustained by the proofs, but are flatly contradicted by them, the facts appearing to be altogether different, and such as I have already stated in my review of the uncontradicted testimony. The complainant's own testimony is entirely inconsistent with them; she even testifies that she never asked her father for the securities otherwise than by giving Mr. Rossell the letter which I have quoted above, and it nowhere appears in the testimony that any request for the securities was made except that made by Mr. Rossell at the interview when he presented the letter.

It is true that in her direct examination she stated that the raising of money was her prime motive for making the trust, but it is impossible for me, in view of all the thoroughly

proven and admitted facts and circumstances, to understand how or why it should have been necessary to create a trust for the purpose of using her Pennsylvania Railroad stock as collateral for a loan of eight hundred dollars. On cross examination when asked the following question (page 39 of the testimony) "I will ask you if Dr. Ogle did not advise you to put those securities in trust with the Security Trust and Safe Deposit Company for the purpose of saving them?" She replied, "Well, he did. That was partly the reason I was to put it in. The other reason was to raise money." "There were two reasons. The first was to save those securities, and the second was to raise money on the Pennsylvania Railroad stock." The evdence, however, is overwhelmingly against the assumption that the settlement in trust was a condition precedent to her obtaining possession of the Pennsylvania Railroad stock. The immediate raising of money may well have been the motive that induced her husband to accede so cheerfully and heartily to the plan of creating a trust, but in the light of all the testimony the motives and reasoning which brought him to that state of mind do not tend to make this case one in which a court of equity should interpose by annulling the trust.

In consequence of the failure of proof on these points her counsel practically abandoned this aspect of the case as it was presented in the bill, and in his argument he relied mainly upon the essentially inconsistent allegation contained in the seventh paragraph of the bill, as follows:

"And that in all the foregoing matter your said Orator acted without legal advice, and had no conception of the legal effect of accepting the said declaration of trust, but on the contrary was deceived by the false and fraudulent representations made by William G. Crumlish, and other friends, and that the said declaration of trust was accepted by your said Orator while under a misapprehension as to the law governing the same, and was wholly deceived in the facts."

It appears from complainant's own testimony and the arguments of her counsel, that the whole meaning of this alle-

gation is, that when she made the settlement she believed she could at any time revoke it.

Her testimony on that point is "I was told that anything I made I could break." The only confirmation of this statement being her husband's testimony, that he had "assured her she could get it again," and had said that "what she could make she could break."

Dr. Ogle testified that he had no recollection of making any such statement to her.

All the friends and relations of the complainant had unquestionably united in advising her to save this remnant of her little fortune, by putting it out of her husband's power to squander it, in the only way apparently that this could be done; that is, by putting it out of her power to give it to him.

She had managed it prudently and wisely until her marriage, and then, in the short space of three months and twenty days, every penny of it had disappeared, except what was represented by the securities which she had happened to leave in a bookcase or secretary in her father's house, where she could not get at them and put them in his hands, as apparently she had the rest of her property.

The fact that he was a "bookmaker" or "commissioner at the races" as she termed him, might lead one to infer how it had disappeared, but we are not left to mere inference, for one witness testified that he, Crumlish, had said on his return to Wilmington, "that he attended the .horse races in New York and had lost a great deal of it in the way of betting on the races.

"I believe he said he had lost as high as two thousand dollars a day. He said that it was the money they had drawn from the bank here. He said, how foolish they were in having spent it, or how foolish he was in having spent it that way."

It is correctly stated that she had no lawyer to advise her as to the terms of the trust; but the "Trust Officer," Mr. Rossell, can hardly be considered an interested person within the meaning of the cases, although representing the respondent, for the Trust Company was not, properly speaking, a beneficiary, being only interested to the extent of the com-

mission it would receive upon the interest of the fund as a compensation for managing it.

Mr. Rossell went to see her in response to the summons of Dr. Ogle her brother-in-law, and testifies that her purpose expressed at the interview was "to protect the balance of her money, and that all the essential features of the trust were gone over before the trust was signed." He "did not mention her losses, knowing it to be a painful subject." He "did not want to discuss with that poor woman her losses." "She had lost heavily and was downcast, sorrowful and regretful."

There were several interviews, periods of reflection, and consultations with friends, and finally the deliberate execution, in her brother-in-law's house, and with his sanction and encouragement, he having no conceivable selfish interest in the matter, of an instrument so brief in its trust provisions that I have quoted them in full, and so simple and clear that no person of ordinary intelligence could fail to comprehend their full meaning. By its plain terms she parted absolutely, and for life, with the control of the little capital left her, reserving and securing the income and also the power to dispose of the fund by will, and in default of any disposition being made by her, its safe transmission to her children, in case she had any. It is in evidence that she now has one child living.

In cases of this kind a complete review of the circumstances is a necessary preliminary to the consideration of the law, and before digesting the voluminous testimony taken before the examiner, I have read it over many times, examining and comparing every portion of it with extreme care, and have endeavored in the brief summary I have made to omit nothing that had any relevancy, or could contribute in any way, to a full understanding of the facts and circumstances which affect the determination of this cause.

The thoroughness with which the principles involved in the decision of this cause have been discussed by counsel, is evidenced by the fact that none of the important authorities bearing upon the subject have been overlooked in their briefs.

The well known lines of English decisions which follow the great leading case of *Hnguenin vs. Basely* are collected, reviewed and classified in White and Tudor's Leading cases in Equity, beginning with page 597 of Part 1, Vol. 2, and copious citations have been made in all the briefs submitted from such of these authorities as from any point of view could be considered relevant,   viz:

*Hunter vs. Atkyns*, 3 *M. & K.* 113; *Moore vs. Prance*, 9 *Hare* 299; *Cooke vs. Lamotte*, 15 *Beav.* 234; *Nanney vs. Williams*, 22 *Beav.* 452; *Forshaw vs. Welsby*, 30 *Beav.* 243; *Sharp vs. Leach*, 31 *Beav.* 491; *Phillipson vs. Kerry*, 32 *Beav.* 628; *Toker vs. Toker*, 3 *DeG. J. & S.* 487; *Phillips vs. Mullings*, *L. R.* 7 *Ch. App.* 244; *Hall vs. Hall*, *L. R.* 14 *Eq.* 365; *s. c.* (*reversed*) *L. R.* 8 *Ch. App.* 430; *Coutts vs. Acworth*, *L. R.* 8 *Eq.* 558; *Wollaston vs. Tribe*, *L. R.* 9 *Eq.* 44; *Everett vs. Everett*, *L. R.* 10 *Eq.* 405; *Dutton vs. Thompson*, *L. R.* 23 *Ch. Div.* 278.   And in addition, the following English cases are cited, which are not found in White & Tudor's Leading Cases in Equity, *supra:   Tate vs. Williamson*, *L. R.* 2 *Ch. App.* 55; *Allcard vs. Skinner*, *L. R.* 36 *Ch. Div.* 145; *Morley vs. Laughnan*, [1893] 1 *Ch.* 736; *Prideaux vs. Lonsdale*, 1 *DeG. J. & S.* 433; *Smith vs. Iliffe*, *L. R.* 20 *Eq.* 666; *Hanley vs. Pearson*, *L. R.* 13 *Ch. Div.* 545; *Lovesy vs. Smith*, *L. R.* 16 *Ch. Div.* 655; *Anderson vs. Pignett*, *L. R.* 8 *Ch. App.* 180.

There is really but little conflict, however, in these cases. The principle of decision is the same in all, and although some slight confusion may be made to appear by the citation of isolated paragraphs from the opinions, yet a thorough examination of the whole case will almost invariably show that the effort of the court was to apply essentially the same principles as those laid down by Lord Eldon in *Huguenin vs. Baseley*, 14 *Ves.* 273. In that case Mrs. Huguenin, being at the time of the settlement Mrs. Hill, a widow of about forty, had settled all her estates, which were of considerable value, including several manors in England and a plantation in Jamaica, upon Thomas Baseley, a clergyman, whose acquaintance she had just made, and of whom she said in a letter written at the time, "I have the greatest reason to believe

that Providence has raised me up a friend, and that friend is Mr. Baseley, who will take upon himself the trouble of bringing all my affairs in such a plan as I will hereafter be able to conduct them with facility to myself." The reported case is recognized as one of the greatest monuments of English Equity Jurisprudence. The argument in reply of Sir Samuel Romilly, who was of counsel for the complainant, seeking to have the conveyance set aside, was cited and adopted thirty years later by Lord Cottenham in the case of *Dent vs. Bennett*, 4 *Myl. & C.* 269, and Lord Eldon's opinion is justly considered one of his greatest.

After a lucid and exhaustive analysis of the pleadings and proofs Lord Eldon discusses the effect of the absence of a power of revocation in language which has been applied, according to the peculiar circumstances of each case, in most of the subsequent English authorities cited by counsel for the complainant in this cause, and relied upon by him to support his contention. Lord Eldon's language was as follows:

"To the question, whether, these instruments being such as I have represented them, the consequence is, that this Court shall undo them, I answer no; if they are pure, voluntary, well understood, acts of her mind: but if they have not that character, if they are the result of her notion, that this is the true effect of that friendly assistance, that kind, providential, interference, to which she was looking for the management of her affairs with advantage and facility to herself, if the conveyance was executed under the effect of that, which has always been considered in this Court as undue influence, if the deeds themselves, which are the best evidence, demonstrate, and if they are confirmed by extrinsic evidence, that they are not the pure, well understood, acts of her mind, this Court will undo them.

"Has an instance ever occurred, that a person, situated as this lady, was permitted to execute such instruments as these; with a purpose of marriage demonstrated upon one of them; and having a mother, and other persons, whom she regarded with affection and anxiety for their welfare in life? Lord Hardwicke reasons with great force as to the voluntary

deed upon the same principle, which induced me to ask, how it happens, that there is no power of revocation in this instrument. There was in that deed a power of revocation; but it was a power to revoke in the presence of three persons, who perhaps never could be got together; which was therefore considered strong evidence, that the party did not understand the transaction; whence arose a strong inference of an undue purpose. There is in this case an attempt to shew, why there was not a power of revocation; and that is a part of the transaction, one of the most liable to objection."

Complainant's counsel in a long and carefully prepared and arranged brief, discuss the pending cause in every aspect, but their real contention is stated as follows:

"We come before the Court, then, upon the facts clearly shown, asking for a revocation of the trust upon the ground of mistake."

And in support of this contention they submit several propositions, which I will quote, as they constitute a clear and adequate presentation of complainant's case in the words of her own counsel:

"1. It is a well settled rule, as well settled as any other rule of law or equity, that an executed voluntary settlement, not tainted with fraud or affected by mistake, is binding on the settlor.

"This rule is well fixed, and most certainly is not disputed by us.

"2. On the other hand, an equally well settled rule in equity is that an instrument obtained by fraud, or which is executed under a mistake, and so as not to correctly represent the intention of the party executing the same, will be set aside on the application of the grantor.

"A principle so well recognized as this, seems to require no citations in its support. The courts have always recognized it, but the different courts have grounded it upon two different reasons: (a) Courts have held it to be an exception in equity to the maxim *ignorantia juris non excusat.* (b) Courts have held that fraud or mistake should always be treated as questions of fact.

"3. Mistake in a voluntary conveyance, whereby the

intention of the settlor is not carried out, is fatal, and the absence of a power of revocation is *prima facie* evidence of mistake."

It is obvious from the statement I have made of the facts presented in this cause, assuming the foregoing propositions to be a full and accurate statement of the law applicable to those facts, that the only thing appearing in the proofs upon which the complainant can ask this Court to set aside her trust settlement, is her own statement that she did not intend to make it irrevocable; that when she made it she thought she possessed the power "to break it."

It is also obvious in view of all the circumstances preceding and surrounding the settlement, that in order to find in this any support for her contention, it is necessary to hold that the last proposition of complainant's counsel, to wit,. "the absence of a power of revocation is *prima facie* evidence of mistake," is a rule to be applied absolutely and without qualification.

In support of this proposition, they quote a couple of sentences from *section 67* of *Bispham's Principles of Equity*, but not the whole paragraph in which they occur. The painstaking examination I have made of the whole range of authorities, both English and American, has led me to the conclusion that no more accurate and comprehensive statement of the true rule can be found in the books than that contained in this paragraph, and I will, therefore, quote it with unqualified approval. Mr. Bispham says:

"It some times happens that the voluntary settlor himself seeks the aid of a court of equity to have the settlement revoked; and the question has then arisen whether in such settlements powers of revocation ought not to be inserted, and how far an irrevocable settlement, in the absence of any motive for an irrevocable gift, can be sustained. There has been some fluctuation of authority upon this point; but the rule seems to be that the absence of a power of revocation is nothing more than a circumstance to be taken into account, and is of more or less weight according to the other circumstances of the case. Where the intent to make an irrevocable

gift is perfectly apparent, or where even in the absence of such a clear intent, a sufficient motive (such as the protection against the grantor's own extravagance, or the like) for making such a gift exists, the settlement cannot be disturbed. But where the deliberate intent does not appear and no motive exists, the absence of a power of revocation is *prima facie* evidence of mistake. It need scarcely be added that the mere reservation of a right of revocation is not inconsistent with a declaration of trust." *Bisph. Eq.* (*5th Ed.*) 119, *sec.* 67.

In the notes to this paragraph are cited the following cases, which almost without exception have been cited and commented upon by counsel in this cause:

*Tucker vs. Bennett, L. R. 38 Ch. Div.; Merriman vs. Munson,* 134 *Pa. St.* 114; *Reidy vs. Small,* 154 *id.* 505; *Hall vs. Hall, L. R. 8 Ch. App.* 430; *Garnsey vs. Mundy,* 24 *N. J. Eq.* 243; *Russell's Appeal,* 75 *Pa. St.* 269; *Miskey's Appeal,* 107 *id.* 628; *Bristor vs. Tasker,* 135 *id.* 119; *Doran vs. Mc-Conlogue,* 150 *id.* 115; *Toker vs. Toker,* 3 *De G. J. & S.* 487; *Villers vs. Beaumont,* 1 *Vern.* 100; *Naldred vs. Gilham,* 1 *P. Wms.* 577; *Hugenin vs. Baseley,* 14 *Ves.* 273, 300; *Petre vs. Espinasse,* 2 *M. & K.* 496; *Bill vs. Cureton, id.* 503; *Hastings vs. Orde,* 11 *Sim.* 205; *Phillips vs. Mullings, L. R. 7 Ch. Div.* 244; *Cooke vs. Lamotte,* 15 *Beav.* 234; *Wollaston vs. Tribe, L. R. 9 Eq. Cas.* 44; *Hellman vs. McWilliams,* 70 *Cal.* 449; *Thurston, Pet'r,* 154 *Mass.* 596; *Sargent vs. Baldwin,* 60 *Vt.* 17; *Howard vs. Howard, id.* 362.

There is a noticeable difference between many of the English and the American cases in the consideration given by them, respectively, to the absence of a power of revocation as evidence in itself of mistake, on account of which a voluntary deed or settlement should be set aside. A reason for this, however, is apparent when the circumstances of the cases are examined with sufficient care. In the great majority of cases in England, partly, no doubt because of the great expense attending a suit in the Court of Chancery, bills to set aside voluntary trusts are concerned with large estates consisting of manors, mines, leasehold town properties and colonial possessions, upon the skilful management of which the

revenue and permanent value of the estate depends, and the settlement or trust deed necessarily contains, much intricate detail expressed in technical language unintelligible to a layman, while the wisdom of many of its provisions can only be determined by future events.

In the American cases, on the other hand, the difference in social conditions and the greater simiplicity and economy of procedure in our equity courts, result in the bringing of suits to set aside simple and plain settlements of small properties in money and securities, just as in the cause pending, which do not involve the same elements of difficulty and complexity as do those in most of the English cases.

It should also be noted that the power of revocation referred to by the English Court of Chancery is not, in general, an absolutely unqualified power in the settlor or grantor to annul his deed at will, but one to be exercised only with the approval of some suitable person or persons designated in the deed, or upon the happening of certain specified contingencies which would essentially alter the conditions existing at the time the trust was created.

The case of *Taylor vs. Buttrick*, 165 *Mass.* 547, (July 19, 1895) is a very late and well considered American decision, reviewing the earlier Massachusetts authorities. A bill in equity was filed to set aside a trust deed executed by the plaintiff in 1893, when she was nearly twenty-two years of age and about to be married. It had been heard by Holmes, Justice, who dismissed the bill, and, at the plaintiff's request, reported the case for the consideration of the full Court. The Court sustained Justice Holmes' order dismissing the bill, and say:

"The general rule in this Commonwealth is, that a voluntary settlement, when completely executed with no power of revocation reserved, cannot be revoked or set aside except upon proof of mental incapacity, mistake, fraud, or undue influence. *Hildreth vs. Eliot*, 8 *Pick.* 293; *Falk vs. Turner*, 101 *Mass.* 494; *Viney vs. Abbott*, 109 *Mass.* 300; *Sewall vs. Roberts*, 115 *Mass.* 262; *Keyes vs. Carleton*, 141 *Mass.* 45; *Thurston, petitioner*, 154 *Mass.* 596, 597.

"In the case at bar it is expressly found that the plaintiff acted freely, intelligently, and wisely, and that the deed was explained to her. Whether she understood precisely what was the legal effect of the deed is unimportant, if she understood its contents. No settlement of a married woman could stand, however beneficial to the settlor it might be, if she could have it set aside on her testimony that she did not understand its legal effect. If it is shown that the instrument was explained to her, and that she understood its contents, which is fairly to be inferred from the report in this case, there is no mistake in a legal sense because its legal effect was not fully understood by her.

"It is contended for the plaintiff that there was a mistake in not inserting a power of revocation; but at the time the deed was executed she was about to marry and leave her mother and stepfather. His conduct is found to have been 'only with a view to the plaintiff's good,' and that, in advising her to put $75,000 of her property in trust, 'his advice was wise and proper.' The purpose of a trust deed made in contemplation of marriage is, as is said by Chief Justice Chapman in *Falk vs. Turner,* to disable the wife 'from disposing of the property while under the influence of her husband, and thus relieve her from exposure to such influence.' If such a power had been inserted, it would have defeated the object of the settlement. *Thurston, petitioner, ubi supra.*

"It is further contended that the deed did not give the plaintiff sufficient protection, because it contained no restraint against anticipation of the income; but it is well settled in this Commonwealth that 'a person cannot settle his property in trust to pay the income to himself for life, with a provision that it shall not be alienated by anticipation, so as to prevent his creditors from reaching the income.' *Pacific National Bank vs. Windram,* 133 *Mass,* 175; *Jackson vs. Von Zedlitz,* 136 *Mass.* 342.

"We are aware that the courts in England, in recent times, have decided some of the questions above considered in a different manner from this court. In England it appears from the decisions that a power of revocation is generally in-

serted in trust deèds, and its absence is the principal ground
for setting aside such a deed; but in this Commonwealth such
a power is rarely to be found, and, as shown above, its presence
would generally defeat the object for which the deed is made."

Is it not manifest that in the case of Mrs. Crumlish, the
complainant in the pending cause, the purpose of the trust
deed was in like manner "to disable the wife from disposing
of the property while under the influence of her husband, and
thus relieve her from exposure to such influence," and that "if
such a power had been inserted, it would have defeated the
object of the settlement?" The incidents of her short mar-
ried life had so thoroughly demonstrated the nature and extent
of her husband's influence, that she, as well as her friends
and relatives, must have been well aware of it and musthave
known that it would have rendered a trust settlement con-
taining an unqualified power of revocation but a feeble pro-
tection.

In *Reidy vs. Small*, 154 *Pa. St.* 505, (1893) the bill filed
by the settlor for setting aside a voluntary trust deed was dis-
missed and the court discussed the effect of the absence of a
power of revocation, citing some of the well known English
cases I have referred to, as follows:

"The true rule as correctly stated by the master, is laid
down in *Toker vs. Toker*, 3 *DeG. J. & S.* 487: 'The absence of
a power of revocation is a circumstance to be taken into ac-
count, and is of more or less weight according to the other
circumstances in the csase.' Where the deed confers a gratu-
ity on the grantee, *Cooke vs. Lamotte*, 15 *Beav.* 234; or a large
benefit accrues to the trustee, *Wollaston vs. Tribe*, *L. R.* 9 *Eq.*
44; or it appears that no provision was made for a serious con-
tingency, such as the survivorship of the settlor, as in Rus-
sell's Ap., 75 *Pa.* 269; or where a revocable deed would have
answered the purpose of the trust as well as an irrevocable
one, *Hall vs. Hall*, *L. R.* 14 *Eq.* 365, the absence of a power
of revocation becomes important. But the want of such a
power in this deed, under the circumstances we have stated,
needs no explanation. An explanation would have been neces-
sary if one had been inserted, for the obvious suggestion, then,

in view of the purpose, would have been, why execute the trust at all, when with such power it is no protection against the very act to be guarded against.

"We think the execution of this deed, under all the circumstances, was a wise act on the part of the plaintiff; both he and his trustee have access to the court, who will see to it that the trust is faithfully executed. There is no reason shown why it should be revoked, while there are many why it should be sustained.' '

In *Parker vs. Allen*, 14 *N. Y. Supp.* 265, the power of revocation was discussed by the Court to the same effect.

The Pennsylvania cases cited by the complainant's counsel were decided before the case of *Reidy vs. Small, supra,* and in the New Jersey case which he cites, *Garnsey vs. Mundy,* 24 *N. J. Eq.* (9 *C. E. Green*) 245, although a voluntary deed of trust was set aside, it was for reasons in harmony with the rules laid down in the other American cases cited, as appears from the lollowing language:

"The grantor had no advice whatever, except that which her mother and uncle gave her. Not only was she not consulted in regard to the matter in any way, but it is clear that she did not understand the provisions of the deed, nor their effect. She did not suppose that the effect of the conveyance would be to place the propertv beyond ber reach and control. Nay, her mother and uncle both supposed that the trust was revocable, and that the grantor, under it, retained full power to sell the property with the trustee's consent. The conveyance not only deprived the grantor of all her property, without reserving a power of revocation to enable her to meet the exigencies of life, but the arrangement which it made was in other respects injudicious, disadvantageous, and improvident. The motives and intentions of the mother and uncle were most praiseworthy. Their design, manifestly, was simply to put the property in such a position, that the grantor could not dispose of it without her mother's consent and concurence. They, in good faith, urged her to make the deed. She and they were alike under an erroneous impression as to the effect of it. From the operation of such a conveyance, made under

such circumstances, equity will relieve the complainants." This case also cited from the familiar English case quoted in *White and Tudor's Leading Cases in Equity supra.*

So far as I have been able to discover, there are no American cases *contra*, and recurring to the English cases, it appears that whenever the circumstances presented, clearly indicated that the purpose of the trust is such that a power of revocation would be likely to defeat it, as in the Massachusetts, New York and Pennsylvania cases I have cited, or in the pending cause, the utterances of the court are in accord with the American cases from which I have quoted.

In a comparatively late English case, *Henry vs. Armstrong, L. R. 18 Ch. Div.* 668 (1880), Kay, Judge, speaks as follows:

"The settlor had a wife and children who were the objects of the settlement, and it would be impossible for the trustees, if they did their duty, to have it revoked in the smallest particular. Any such power would be an idle thing in such a case as this. Therefore I disregard the circumstance that in this settlement there is not any power of revocation, for any such power would be inconsistent with the objects of the settlement."

An important and exceptionally interesting case upon the subject of revocation is that of *Hall vs. Hall, L. R. 18 Ch. App.* 430, (1873) which reverses Vice-Chancellor Wickens, (his decision rendered the preceding year and reported *L. R. 14 Eq.* 365, being cited in *Reidy vs. Small, supra,* without reference to the decision reversing it) and lays down the rule substantially as set forth by Bispham, *supra.*

This case I take to be the authoritative interpretation upon this point, of the rulings in *Huguenin vs. Baseley* and the succeeding English authorities cited *supra.*

Lord Justice James first reviews the authorities and refers to the great leading case on the subject, as follows:

"It is said to have been laid down in *Huguenin vs. Baseley,* that the absence of a power of revocation was strong evidence that the party did not understand the transaction: [His Lordship then read from Lord Eldon's judgment.]

"If, however, it had been considered by the distinguished counsel and the eminent Judge in that case, that the matter could have been disposed of easily and summarily on the mere ground that there was an omission of a power of revocation not satisfactorily accounted for, the vivid eloquence of the Advocate (the charm of whose argument was represented by Lord Cottenham many years afterwards as still fresh in his recollection) and the elaborate and exhaustive judgment of the Judge which has made that case one of the most celebrated and valuable in our reports, would have been superfluous, if not an idle display of intellectual power—a mere forensic and judicial exercise."

His own conclusions are expressed in the following vigorous language:

"It appears, therefore, from the examination of the authorities, that there is no such rule as that to which the Vice Chancellor conceived himself constrained to yield.

"Is there, then, any foundation in principle for such a rule? The law of this land permits any one to dispose of his property gratuitously, if he pleases, subject only to the special provisions as to subsequent purchasers and as to creditors. The law of this land permits one to select his own attorney to advise him; and it seems very difficult to understand how this Court could acquire jurisdiction to prescribe any rule that a voluntary conveyance executed by a person of sound and disposing mind, free from any fraud or undue influence of any kind, and with sufficient knowledge of its purport and effect, should be void because the attorney of his own selection did not advise him to insert a power of revocation, or did not take his express direction as to the insertion or omission of such a power. It might, with as much reason, have prescribed that such a deed should be executed and so attested as is required for a will, or that, like a married woman's deed, it should be acknowledged before a judge or commissioner."

Lord Chancellor Selborne concurred, as follows:

"On the rest of the case I never felt any doubt. The absence of a power of revocation in a voluntary deed, not im-

peached on the ground of any undue influence, is, of course, material when it appears that the settlor did not intend to make an irrevocable settlement, or when the settlement itself is of such a nature, or was made under circumstances, as to be unreasonable and improvident unless guarded by a power of revocation. I do not, however, see on what principle the absence of such a power can be considered material in a case like the present, from which both these elements are absent."

I have deemed it necessary to review the authorities thus fully, because the points raised in this cause have never been passed upon in this Court. The single case cited from our own reports is that of *Kerr vs. Couper*, 5 *Del. Ch.* 507. In that case there was a voluntary deed of trust of land, and upon the application of the grantor, the trustee concurring in the application by his answer, Chancellor Saulsbury decreed a reconveyance of the estate by the trustee on the ground that considering the circumstances under which the conveyance was made, and the ignorance as to the effect thereof by the complainant, the wishes of the parties thereto should prevail.

It only remains for me to state that in this cause I am brought to the conclusion that it appears, beyond a doubt, that the main purpose of the trust settlement, which the complainant now asks this Court to set aside, was to protect from the extravagant folly of her husband all that remained of her property, and that she made the settlement voluntarily, understandingly and with full realization that the only way to effect its purpose was to put it out of her own power to surrender her property to him in response to future solicitations or demands.

That an absolute power of revocation would have defeated this purpose, and rendered the settlement nugatory so far as its main object was concerned, is so obvious that it seems impossible to believe that she was not aware of it. It follows, therefore, that the bill must be dismissed with costs; the costs to be paid out of the trust estate.

Let the decree be entered accordingly.